IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs December 2, 2020

IN RE JEREMY C. ET AL.

Appeal from the Circuit Court for Hickman County
No. 2017-CV-28          Michael W. Binkley, Judge

No. M2020-00803-COA-R3-PT

This is a termination of parental rights case, focusing on Jeremy C. and Jessica C., the minor children ("the Children") of Grace C. ("Mother") and Jonathan H. ("Father"). The Children were originally removed from Mother's home in December 2014 upon an emergency petition filed by Mother's cousin in the Hickman County Juvenile Court ("juvenile court"). At the time of removal, Father had been incarcerated for approximately two years. The Children were then placed with Mother's cousin and her husband while also receiving services from the Tennessee Department of Children's Services ("DCS"). In March 2015, the juvenile court adjudicated the Children dependent and neglected. Upon a petition for relinquishment subsequently filed by the cousin and her husband, the Children were taken into DCS's protective custody via an order entered by the juvenile court in March 2016. Following a hearing and upon DCS's allegations that the Children had been severely abused while in the care of Mother and while residing with Mother's former paramour, the juvenile court entered an agreed order in September 2016, adjudicating the Children dependent and neglected and severely abused. In July 2017, DCS filed a petition in the Hickman County Circuit Court ("trial court") to terminate the parental rights of Mother and Father to the Children. Following a bench trial, the trial court granted the petition as to both parents.[1] As pertinent to this appeal, the trial court found that statutory grounds existed to terminate Mother's parental rights upon its finding by clear and convincing evidence that Mother had (1) abandoned the Children by willfully failing to visit them, (2) failed to substantially comply with the reasonable responsibilities and requirements of the permanency plans, (3) severely abused the Children, and (4) failed to manifest an ability and willingness to personally assume custody of or financial responsibility for the Children. The trial court further found by clear and convincing evidence that termination of Mother's parental rights was in the Children's best interest. Mother has appealed. Discerning no reversible error, we affirm the trial court's judgment terminating Mother's parental rights to the Children.

---

[1] Father has not appealed the termination of his parental rights to the Children. We will therefore confine our analysis to those facts relevant to Mother's appeal.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and KENNY W. ARMSTRONG, J., joined.

Gary W. Wicks, Sr., Franklin, Tennessee, for the appellant, Grace C.

Herbert H. Slatery, III, Attorney General and Reporter, and Lexie A. Ward, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

## OPINION

### I.  Factual and Procedural Background

The Children were initially removed from Mother's home via a temporary order of custody entered by the juvenile court on December 29, 2014, in response to a *pro se* emergency petition, subsequently amended, filed by Mother's cousin ("Cousin"), alleging that the Children were dependent and neglected due to substance abuse, domestic violence, and physical abuse in Mother's home, as well as environmental, educational, and medical neglect.  At the time, Jeremy was eleven years of age, and Jessica was ten.  The parents had never been married to each other, and according to Mother's testimony, they had not resided together since shortly after Jessica's birth.  Father's paternity as to both Children was undisputed.  The record reflects that at the time of the Children's removal, Father was incarcerated in Kentucky and had received a twelve-year sentence of incarceration in 2012 on convictions of second-degree manslaughter, first-degree wanton endangerment, and aggravated operation of a motor vehicle under the influence of alcohol/drugs.  At the time of removal, the Children had been residing with Mother and her then-paramour, H.H.

In amending the petition, Cousin's husband joined her as a petitioner (collectively, "Cousins"), and they averred that following an "intervention" by family members, Mother had been admitted to Vanderbilt Psychiatric Hospital ("Vanderbilt") in December 2014 for treatment of depression and substance abuse issues.  Cousins also averred that at the time of her admission, Mother had tested positive for methamphetamines, barbiturates, opiates, and two other narcotics.  In its December 29, 2014 order, the juvenile court awarded temporary custody of the Children to Cousins and simultaneously ordered DCS to perform a home study of Cousins' home.  DCS subsequently filed the first of several affidavits of reasonable efforts in January 2015.

On February 10, 2015, Cousins, now acting through counsel, filed a second amended dependency and neglect petition in the juvenile court, incorporating their previous allegations and also alleging that following Mother's discharge from Vanderbilt, she had failed to participate in Vanderbilt's "Intensive Outpatient Program" and had refused a drug screen and intake attempted by Health Connect America ("Health Connect"), which had been initiated by DCS. Cousins further alleged that the Children had revealed previous abuse, including that H.H. had been physically abusive toward Jeremy, required Jessica to wear a dog's electric shock collar, and required the Children to shower behind a clear shower curtain so that he could observe them. Cousins averred in their second amended petition that Jessica had been involved with "inappropriate internet contact with adult males" and had "acted out inappropriately in a sexual manner on two occasions." They also averred that H.H. had physically abused Mother in front of the Children and that Mother had witnessed some of H.H.'s abuse against the Children but failed to protect them.

Following a hearing, the juvenile court adjudicated the Children dependent and neglected in an order entered on March 17, 2015. Mother, who appeared at the hearing and was represented by her former counsel, stipulated to a finding that the Children were dependent and neglected due to her involuntary hospitalization, mental health issues, illicit drug use, and the Children's truancy issues. *See* Tenn. Code Ann. § 37-1-102(b)(13)(A), (C), and (F) (Supp. 2020).[2] The juvenile court ordered, *inter alia*, that Jeremy would remain in the care of Cousins while Jessica would begin a trial home placement with Mother on March 21, 2015. The juvenile court directed DCS to open a family support service case to assist the family and directed Mother to cooperate with DCS, address her mental health issues through therapy, and address her substance abuse issues through an intensive outpatient alcohol and drug treatment program. The juvenile court also ordered that the Children were to have no contact with H.H. The Children's interests were represented during this adjudicatory hearing by attorney Richard Boehms acting as their guardian *ad litem* ("GAL").

On June 9, 2015, the juvenile court entered an agreed order of disposition, placing Jessica with Mother after the completion of the trial home placement and retaining placement of Jeremy with Cousins. In this order, the juvenile court maintained Mother's tasks addressed in the adjudicatory order, DCS's assistance to the family, and the no-contact order concerning the Children and H.H. In addition, the juvenile court directed Cousins to set up an outpatient mental health intake appointment at Centerstone in

---

[2] At the time of the dependency and neglect petition's filing, the definition of a dependent and neglected child was codified at Tennessee Code Annotated § 37-1-102(b)(12) (2014), which was the version cited by the juvenile court in its adjudicatory order noting Mother's stipulation. Effective July 1, 2016, the General Assembly has renumbered the applicable definition to subsection -102(b)(13). *See* 2016 Tenn. Pub. Acts, Ch. 979, § 4 (S.B. 2121).

Cookeville ("Centerstone") for Jeremy and directed Mother to set up a similar intake appointment at Centerstone for Jessica with resultant recommendations to be followed. With Mother's participation, DCS developed a noncustodial family permanency plan at this time, incorporating the responsibilities for Mother that had been ordered by the juvenile court.

However, Mother subsequently encountered further difficulties, losing her employment and her home, and on September 15, 2015, the juvenile court entered an agreed order placing temporary custody of Jessica with Cousins. In another agreed order entered on November 10, 2015, the juvenile court maintained the Children's placement with Cousins while providing that Mother was to have no contact with the Children until after psychosexual evaluations could be completed on both Children and a forensic interview then scheduled for Jeremy in December 2015 could be completed. The juvenile court directed DCS to provide therapeutic evaluations for Mother and the Children and to comply with evaluation recommendations.

Following a post-dispositional review hearing, the juvenile court entered an order on January 5, 2016, maintaining custody of the Children with Cousins and providing for at least thirty days of therapeutic visitation between Mother and the Children with the requirement that Mother would have to "submit names to DCS by January 21, 2016 so that DCS may run background checks to find an appropriate supervisor for visits." The juvenile court also directed Mother to provide DCS with updated address and telephone information. Stating that this was a final order, the juvenile court directed Mother to "file a new petition after she has obtained appropriate housing and a legal means of income and is better able to care for the children."

On February 26, 2016, Cousins filed an "Emergency Motion for Placement of the Children," which they orally amended during a hearing conducted on March 1, 2016, to a petition for relinquishment of the Children. In their motion, Cousins averred, *inter alia*, that the Children could no longer stay in Cousins' home because the Children's needs could not be met there. In a "Bench Order" entered at the close of the hearing, the juvenile court awarded temporary custody of the Children to DCS upon determining that "[b]ased on further disclosures of the children since the last court hearing, the aggression of Jeremy and the recommendations of the professionals in the home, [Cousins], through no fault of their own, are unable to address the issues of the children." The juvenile court also found that based on the testimony of a DCS family support services worker, Cynthia Primm, Mother had exercised therapeutic visitation with the Children only one time and had failed to provide DCS with a list of suitable supervisors or a permanent address and telephone number as previously ordered.

In response to the order placing the Children in protective custody, DCS filed a petition on June 7, 2016, alleging, *inter alia*, that in addition to the facts found during the juvenile court's prior adjudication of the Children as dependent and neglected, the Children had been severely abused in Mother's care "due to exposure to pornography and/or failure to protect from said exposure." *See* Tenn. Code Ann. § 37-1-102(b)(27). DCS also alleged that while the Children were in Mother's care, H.H. had been physically abusive toward both of the Children, which included dragging Jeremy across a room by his hair and leaving marks on Jessica's back and buttocks that "appeared to be caused by some kind of cord looped and swung over Jessica's shoulder." DCS further alleged that during a previous investigation, Jessica had reported being sexually abused by another individual while in Mother's care but that Mother had failed to secure a forensic interview and examination for Jessica. DCS averred that while living with Cousins, the Children had been "caught" acting out sexually with each other and that they had admitted to similar behavior previously when living with Mother and H.H.

Following a hearing, the juvenile court entered an "Agreed Order of Adjudication and Disposition," on September 29, 2016, finding the Children to be dependent and neglected and severely abused "based upon the Mother's exposure of the children to pornography and failure to protect the children from pornography," as well as Father's incarceration. Noting that Mother and Father had waived "their rights to hearings and appeals regarding the claims of dependency and neglect and severe abuse," the juvenile court also noted Mother's announcement during the hearing, through counsel, as follows:

> [Mother], after consultation with her attorney, announced her desire to resolve the pending litigation with the Department of Children's Services. As such, the Mother is not contesting the factual findings or conclusions of law but makes no admissions of wrong doing that could potentially be used against her in other proceedings. This agreement is akin to a best interest plea in criminal court.

By the time of this adjudicatory hearing, attorney Kelli Barr Summers was serving as Jessica's GAL ("Jessica's GAL") while Mr. Boehms continued to represent Jeremy's best interest ("Jeremy's GAL").

Prior to the filing of the petition for termination of parental rights, DCS developed three permanency plans for the Children and the parents.[3] All three plans were presented as exhibits during the termination proceedings. The first permanency plan was

---

[3] The permanency plans were primarily focused on the Children and Mother. Inasmuch as Father was incarcerated during the development of all three plans, his action steps were confined to requirements that he contact DCS in the event that he was released from prison and begin then to participate in services aimed at reunification with the Children.

established on March 29, 2016, and ratified by the juvenile court on June 7, 2016. Mother participated in the child and family team meeting ("CFTM") during which the plan was developed, but she failed to appear during the ratification hearing. The juvenile court noted in its ratification order that Mother's counsel had agreed to entry of the order via telephone during the hearing based on Mother's prior agreement to the plan during the CFTM. The juvenile court found in the order that the stated alternate goals in the plan of "exit custody with relative" or "adoption" were appropriate and in the best interest of the Children. The juvenile court also found that Mother's responsibilities set forth in the plan were "reasonable, related to remedying the conditions that necessitate[d] foster care, and in the best interest of the children."

Under the initial permanency plan, Mother's relevant responsibilities and requirements were to (1) contact the local child support office and make sure that she was in compliance with child support guidelines; (2) have a stable home for six months with no interruptions in rent and utilities; (3) cooperate with unannounced home visits made by a family service worker; (4) provide updated address and contact information to a family service worker; (5) continue seeking employment; (6) remain drug and alcohol free and submit to drug screens; (7) continue participating in mental health counseling through Centerstone; (8) contact the "Homeless No More" program, for which she had been provided information during the CFTM; and (9) attend all medical, counseling, and medication appointments and take medications as prescribed. The plan reflected that Mother was to have no visitation with the Children until she "complete[d] all services that were court ordered." It is undisputed that Mother had failed to comply with the previously ordered requirement that she provide a list of potential supervisors for therapeutic visitation.

A second permanency plan was established on September 29, 2016, and ratified by the juvenile court on November 29, 2017. Mother and her counsel were present during the hearing, and Mother indicated through her signature that she had participated in the plan's development. However, Mother also indicated in the plan that she disagreed with the goal of "adoption," which was stated as an alternate goal to "exit with relative." Mother's requirements and responsibilities under this revised plan remained essentially as under the initial plan with the added specific requirements that she pay a total of $300 monthly in child support, provide documentation of stable housing, notify a family services worker of contact information changes within ten days, participate in parenting and substance abuse treatment services at Main Street Interventions ("Main Street"), and sign a release of information from Centerstone. At the time of the second plan's

development, Mother had obtained employment at Masonite in Dickson, and the plan included a requirement that she maintain her employment.[4]

Although Mother was still not allowed contact with the Children, this second permanency plan provided: "Per [discretion] of all counselors the children and mother will develop a plan to begin to reintegrate mom back to their lives under a safe and appropriate setting." In the plan, "[c]ompliance of treatment services," "[c]ompletion of court ordered services in regards to [Mother]," and the Children's "relationship with one another" were noted as conditions preventing the Children from leaving DCS custody. In addition, stating that DCS had been granted severe child abuse findings against Mother, the plan provided: "Depending upon [Mother's] progress, [DCS] will determine whether to be relieved of reasonable efforts at a later date and begin the termination of parental rights process if [Mother] fails to make progress." In its order ratifying the second permanency plan, the juvenile court again found that the alternate goals of "exit custody with relative" or "adoption" were appropriate and in the best interest of the Children and that the requirements set forth for Mother were reasonably related to the goals of the permanency plan. The juvenile court subsequently entered a "Housekeeping Order" on December 2, 2016, adding to its ratification order that Mother had been "apprised of the statutory definition of abandonment and the grounds for termination of parental rights in open court on November 29, 2016."

The third permanency plan was established on January 27, 2017, and ratified by the juvenile court on March 24, 2017. Mother and her counsel were again present for the ratification hearing. Although Mother's counsel was present during the CFTM at which the plan was developed, Mother did not attend the CFTM. Mother's responsibilities and requirements remained essentially unchanged under this final plan, and the juvenile court again found them to be reasonably related to the conditions that necessitated foster care and the unchanged goals of the plan. In its order ratifying the third plan, the juvenile court found that Mother was not in substantial compliance with the previous permanency plan, stating that "Mother [had] not completed action steps on permanency plan." While finding in its ratification order that DCS had made "reasonable efforts toward finalizing the permanency goals," the juvenile court granted DCS permission to be relieved of making reasonable efforts in the future, pursuant to Tennessee Code Annotated § 37-1-166, as to Mother "due to severe child abuse" and as to Father due to his criminal convictions. The third plan included a provision that if Mother were to complete the required action steps on her own and DCS were relieved of making reasonable efforts to assist her, Mother would "file with the court to ask for visitation to be reinstated."

---

[4] In the second permanency plan, Mother's employer was listed, apparently phonetically, as "Mason Knight." However, Mother testified during the termination trial that she had been working during the time of the second plan's development at Masonite.

On July 7, 2017, DCS filed its petition to terminate the parental rights of Mother and Father in the trial court, alleging as to both parents the statutory ground of failure to manifest an ability and willingness to personally assume custody of or financial responsibility for the Children. Specifically as to Mother, DCS also alleged the statutory grounds of abandonment by willful failure to visit the Children during the four months preceding the filing of the termination petition, substantial noncompliance with the reasonable responsibilities and requirements of the permanency plans, and severe abuse of the Children. As to Father, DCS separately alleged the statutory grounds of abandonment by willful failure to financially support the Children and abandonment by conduct exhibiting wanton disregard for the Children's welfare prior to his incarceration.

The trial court conducted a bench trial over the course of three nonconsecutive days on November 5, 2018; January 16, 2019; and June 3, 2019. DCS presented testimony during trial from five DCS employees or former employees who had worked with the family: Emily James, an assessment worker who investigated referrals; Cynthia Primm, a family support services worker who had worked to provide services to the family before the Children were taken into DCS's protective custody; Miranda Ray, a social service team leader who supervised the Children's foster care case from the time they were taken into protective custody; Christina Baxter, a former family support services worker who had worked with the family from the time the Children were taken into protective custody until Ms. Baxter left DCS in September 2017; and Melissa Stults, who had replaced Ms. Baxter as the family support services worker assigned to this family. DCS also presented testimony from each of the Children's foster mothers: respectively, C.B. ("Jeremy's Foster Mother") and C.D. ("Jessica's Foster Mother").

Mother testified on her own behalf and also presented testimony from C.P., a residential manager at Bridges Domestic Violence Center in Williamson County ("Bridges"), a domestic violence center where Mother had been housed in March 2017. In addition, each of the Children testified separately in a courtroom closed to all but the trial court judge and the attorneys involved in the case. Although Father was represented by counsel throughout the trial, he personally appeared only during the second day, by which time he had been released from incarceration, and according to his work supervisor's testimony, had been employed by a tree service since April 2018. Father did not testify. The trial court also considered separate recommendations from Jeremy's GAL and Jessica's GAL that termination of Mother's and Father's parental rights would be in the Children's best interest.

Testimony demonstrated that Mother had not been in contact with DCS for approximately four months prior to the filing of the termination petition. Ms. Baxter, who had been the family services worker for the case from the time of the Children's removal from Mother's home until September 2017, testified that in the time that she was

assigned to the case, she knew of three different homes in which Mother had lived, staying once with H.H.'s sister for a time and once with a male friend, S.P. Ms. Baxter also testified that in January 2017, Mother had communicated that she was homeless and sleeping in her car. Ms. Baxter reported that her last contact with Mother was a telephone call she received in March 2017 when Mother stated that she was staying in a domestic violence shelter in Nashville and had been involved in an altercation with H.H., who, according to Mother, was in jail. Ms. Baxter also reported that Mother had never provided proof to DCS that she had completed any of the requirements in her permanency plans. According to Ms. Baxter, Mother had refused Ms. Baxter's request to sign a release form so that DCS could receive information from Centerstone, resulting in Ms. Baxter's inability to discover whether Mother had complied with counseling and medication management requirements.

Mother testified during the second and third days of trial. Concerning her situation at the time of trial, Mother stated that she was currently residing in a three-bedroom mobile home that she shared with her paramour, J.M., and for which she paid $180 weekly in rent. She testified that she and J.M. had been living in this home since June 1, 2018, and that they had resided in the same trailer park since July 11, 2017. Mother presented photographs of her current home, which reflected that it was furnished and appeared well kept. According to Mother, she had been employed at Gap, Inc. ("Gap"), since October 2017 and currently worked a night shift from 11:00 p.m. to 7:00 a.m. Mother stated that since March 2019, she had also been employed at a restaurant, working from 8:30 a.m. to 3:00 p.m. several days a week. Mother stated that she earned $15 an hour at Gap, which included a night differential, and $2 an hour plus tips at the restaurant. Mother also testified that the Children had never met J.M., and she acknowledged that J.M. had been released from prison in 2016 after having served a ten-year sentence for vehicular homicide and driving under the influence. Mother also acknowledged that she had secured her current employment and housing situations after the termination petition had been filed.

In its final order, entered on May 14, 2020, the trial court determined that grounds existed to terminate the parental rights of both parents. The court found by clear and convincing evidence that both parents had failed to manifest an ability and willingness to personally assume physical and legal custody of or financial responsibility for the Children. Specifically as to Mother, the court also found that she had abandoned the Children by willfully failing to visit them during the applicable statutory time period, had failed to substantially comply with the reasonable responsibilities and requirements of the permanency plans, and had committed severe abuse against the Children. As to Father, the court also found that he had abandoned the Children by failing to financially support them and by exhibiting conduct prior to his incarceration that demonstrated wanton disregard for the Children's welfare. The court further found by clear and convincing

evidence that termination of Mother's and Father's parental rights was in the best interest of the Children. Mother timely appealed.

## II. Issues Presented

Mother presents one issue for our review, which we have restated slightly:

1.      Whether the trial court erred in finding by clear and convincing evidence that termination of Mother's parental rights was in the best interest of Jessica, specifically by purportedly failing to consider Jessica's viewpoint based on her testimony and by contemplating permanence in Jessica's pre-adoptive home.

On appeal, Mother has not challenged the trial court's findings that statutory grounds existed to terminate her parental rights to the Children, nor has she challenged the trial court's finding that it would be in Jeremy's best interest to have Mother's parental rights terminated. However, correctly noting that this Court must "review thoroughly the trial court's findings as to each ground for [parental rights] termination and as to whether termination is in the child's best interests," *see In re Carrington H.*, 483 S.W.3d 507, 525 (Tenn. 2016), DCS has presented the following additional issues for our review, which we have restated slightly:

2.      Whether the trial court erred in determining by clear and convincing evidence that statutory grounds existed to terminate Mother's parental rights to the Children.

3.      Whether the trial court erred in finding by clear and convincing evidence that termination of Mother's parental rights was in the best interest of the Children.

4.      Whether, if this Court grants Mother's Tennessee Rule of Appellate Procedure 14 motion, termination of Mother's parental rights should be affirmed in light of the post-judgment fact.

We will therefore consider each of the statutory grounds found by the trial court before proceeding to an analysis of the Children's best interest and Mother's specific argument concerning Jessica.[5]

---

[5] We note that Jeremy will have turned eighteen years of age and therefore will have reached the age of majority by the time this opinion is filed. However, because Jeremy was seventeen years of age at the time of the trial court's final judgment, we will proceed to review the trial court's termination of Mother's parental rights to Jeremy as well as Jessica.

## III. Standard of Review

In a termination of parental rights case, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The trial court's findings of fact are reviewed *de novo* upon the record, accompanied by a presumption of correctness unless the evidence preponderates against those findings. *See* Tenn. R. App. P. 13(d); *see also In re Carrington H.*, 483 S.W.3d at 523-24; *In re F.R.R., III*, 193 S.W.3d at 530. Questions of law, however, are reviewed *de novo* with no presumption of correctness. *See In re Carrington H.*, 483 S.W.3d at 524 (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)). The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002).

"Parents have a fundamental constitutional interest in the care and custody of their children under both the United States and Tennessee constitutions." *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2002). It is well established, however, that "this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)). As our Supreme Court has explained:

> The parental rights at stake are "far more precious than any property right." *Santosky* [*v. Kramer*], 455 U.S. [745,] 758-59 [(1982)]. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of ["]severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(l)(1); *see also Santosky*, 455 U.S. at 759 (recognizing that a decision terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty, N.C.*, 452 U.S. 18, 27 (1981) (discussing the due process right of parents to fundamentally fair procedures).
>
> Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof—clear and convincing evidence. *Santosky*, 455 U.S. at 769. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental

parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.* 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

* * *

In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97.

*In re Carrington H.*, 483 S.W.3d at 522-24. "[P]ersons seeking to terminate [parental] rights must prove all the elements of their case by clear and convincing evidence," including statutory grounds and the best interest of the child. *See In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010).

IV. Grounds for Termination of Mother's Parental Rights

Tennessee Code Annotated § 36-1-113 (Supp. 2020) lists the statutory requirements for termination of parental rights, providing in relevant part:

(a)     The chancery and circuit courts shall have concurrent jurisdiction with the juvenile court to terminate parental or guardianship rights to a child in a separate proceeding, or as a part of the adoption proceeding by utilizing any grounds for termination of parental or guardianship rights permitted in this part or in title 37, chapter 1, part 1 and title 37, chapter 2, part 4.

* * *

(c)     Termination of parental or guardianship rights must be based upon:

(1)     A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

(2)     That termination of the parent's or guardian's rights is in the best interests of the child.

The trial court determined that the evidence clearly and convincingly supported a finding of four statutory grounds to terminate Mother's parental rights: (1) abandonment through willful failure to visit the Children, (2) substantial noncompliance with the reasonable requirements of the permanency plans, (3) severe abuse of the Children, and (4) failure to manifest an ability and willingness to assume custody of or financial responsibility for the Children. We will address each statutory ground in turn.

## A. Abandonment by Willful Failure to Visit

Concerning statutory abandonment, Tennessee Code Annotated § 36-1-113(g)(1) (Supp. 2020) provides, as relevant to this action:

(g)     Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and nonexclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:

(1)     Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred; . . .

Regarding the definition of abandonment applicable to this ground, the version of Tennessee Code Annotated § 36-1-102(1) (2017) in effect at the time of the termination petition's filing in this action defined abandonment in pertinent part as:[6]

---

[6] Effective July 1, 2018, the General Assembly has amended Tennessee Code Annotated § 36-1-102(A) to substitute the phrase, "proceeding, pleading, petition, or any amended petition," in place of "proceeding or pleading." *See* 2018 Tenn. Pub. Acts, Ch. 875, § 1 (H.B. 1856). Pursuant to the same amendment, the words, "willful" and "willfully," have been deleted wherever they previously appeared in subsection -102(1), and a new subsection, -102(1)(I), has been added, providing that the "absence of willfulness" shall be an affirmative defense to abandonment for failure to visit or support, for which "[t]he parent or guardian shall bear the burden of proof." *See id.* at § 2. Inasmuch as the instant action was filed in July 2017, we will confine our analysis in this Opinion to the version of Tennessee Code Annotated § 36-1-102 in effect at that time.

(A)(i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child; . . .

The trial court found that clear and convincing evidence demonstrated Mother's willful failure to visit the Children during the four months preceding the filing of the termination petition. The four-month statutorily determinative period for purposes of abandonment by failure to visit or support began on March 7, 2017, and concluded on July 6, 2017, the day prior to the filing of the termination petition ("Determinative Period"). *See In re Joseph F.*, 492 S.W.3d 690, 702 (Tenn. Ct. App. 2016) (citing *In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb. 20, 2014) (explaining that the applicable four-month statutory period preceding filing of the termination petition ends on the day preceding filing)).

In its final order, the trial court specified the following, in pertinent part, regarding the statutory ground of willful failure to visit the Children:

Before the Children were placed in foster care, Mother usually did not maintain visits or come to the visits [with] which she was provided.

When Mother was given therapeutic visits while the Children were in the physical custody of [Cousins], Mother only attended one (1) visit.

Mother was previously under a court order to submit names of appropriate supervisors for her visits, which she failed to do.

Because of Mother's failure to provide names of appropriate supervisors for her visits with the Children, Mother's visitation was suspended by the [juvenile court].

When [Ms. Baxter] met with Mother in March 2016, Mother discussed with Ms. Baxter how Mother would be able to have her visits reinstated and the protocol for being able to start the visitation plan with the Children.

- 14 -

Mother was told by Ms. Baxter that Mother needed to develop a history of stable housing, a history of mental health services, and compliance with all court orders currently in effect.

Ms. Baxter provided Mother with information regarding *Buffalo Valley*, which provided resources for housing and substance abuse issues for its clients.

In addition, in March 2016, Ms. Baxter met with Mother to develop and discuss a family permanency plan. Mother was told and it was documented that on March 29, 2016, Mother would have to comply with and complete all court-ordered services as promulgated by the Juvenile Court before visitation would be allowed.

In recognition of Mother's responsibilities, she signed the Child and Family Team meeting Summary which stated Mother would have to comply with and complete court-ordered services before the visitation was to begin, which was, at that time, scheduled for March 29, 2016.

Mother admitted on March 29, 2016 she was aware of the requirements for her to have restored parenting time with the Children; and, also, Mother acknowledged the parameters of what she was required to do were discussed in detail with her, and she had, at that time, no contact with the Children.

On March 29, 2016, a Permanency Plan was developed for Mother where, in part, the Plan stated clearly that, "[I]t was ordered that no visitation can occur until [Mother] completes all services that were court ordered."

Mother signed the Permanency Plan acknowledging her understanding of the Plan and her responsibility to comply with and participate in necessary prerequisites in order to have the Permanency Plan become successful and for parenting time of some kind to be implemented.

Mother agreed with the Plan and received a copy of the Plan, as well as her appeal rights, along with her acknowledgement she would have the opportunity to express her disagreement with the Plan.

Mother admitted, throughout 2016, she was aware there was a "no-contact order," and most importantly, Mother was made aware of the underlying facts to support the no-contact order.

Mother further acknowledged exactly what was expected of her to regain her parenting time and have it reinstated with the understanding she was required to finish her classes and comply with all previously court-ordered services.

For the period of time between the placements of the Children in custody until the *Petition for Termination of Parental Rights* was filed, Mother made no progress on her Permanency Plan to reintegrate herself in the Children's lives based upon the Permanency Plan.

In fact, from March 17, 2017 until the date Ms. Baxter filed the *Termination of Parental Rights* petition, Mother made no contact in any way with DCS.

Unfortunately, Mother did not take advantage of the opportunity to correspond with the Children in written form, either by letters, or other type of written contact pursuant to the initial Permanency Plan after the Children were placed in foster care.

Mother was aware she was under an obligation to stay in contact with DCS by acknowledging in three (3) different Permanency Plans and three (3) separate court orders, yet she failed to do so.

In addition, Mother failed to comply with even the minimum and most minimal requirements of her to reintegrate with the Children. For example, Mother did not have a telephone or access to a telephone in 2016, and she had no idea who her case worker was when she finally obtained a telephone in 2017.

Even after the *Petition for Termination of Parental Rights* was filed, DCS did not have a valid address for Mother until November 2018.

In addition, Mother testified she could have had the assistance with supervision of visits at *HomeSafe*, a domestic violence shelter in Gallatin, Tennessee; but, Mother failed to follow up on what she needed to do to implement this assistance.

In late 2018, DCS was able to make contact with Mother through her attorney of record.

Neither Mother independently nor through her attorney filed any pleadings with the Court asking for parenting time based upon completion of the Permanency Plans.

Mother testified she last visited with the Children on January 31, 2016.

(Internal citations to record and paragraph numbering omitted.)  The trial court thereby concluded that although the juvenile court had "suspended Mother's visitation, there was a remedy available to Mother to regain her ability to visit with the minor Children" and that the findings of fact demonstrated "numerous examples of Mother's blatant willful failure to visit the minor Children for four (4) months preceding the filing of the termination petition in this case."  Upon careful review, we agree with this conclusion.

Mother acknowledged at trial that she had not seen the Children since January 31, 2016, when she exercised a supervised therapeutic visit pursuant to the juvenile court's January 5, 2016 post-dispositional order.  In that order, the juvenile court had directed Mother to provide a list of potential supervisors for visitation, which she never did.  Although Mother testified that she had no individuals to place on that list, she also acknowledged that during the Determinative Period, she could have sought help at the domestic violence shelters where she was staying in securing potential visitation supervisors or contacting DCS to seek visitation.

Instead, Ms. Baxter testified that as the family services worker on the case from the time the Children were taken into protective custody through September 2017, her last contact with Mother prior to the petition's filing was a telephone call in March 2017 when Mother told Ms. Baxter that she was staying in a domestic violence shelter in Nashville.  Mother, who C.P. testified was at Bridges from March 6 through March 30 of 2017, did not provide contact information for Bridges to Ms. Baxter.  Moreover, Mother acknowledged at trial that she knew the requirements she needed to fulfill in order to visit with the Children, "[f]inish the classes . . . [f]rom the court-ordered services," but she also acknowledged that she had provided no proof to DCS or to the juvenile court of having completed or even partially completed these requirements.  Mother further acknowledged that she had not petitioned the juvenile court for restoration of her visitation, stating that she "didn't know [she] could."

In concluding that Mother's failure to visit the Children during the Determinative Period was willful, the trial court referenced our Supreme Court's decision in *In re*

*Adoption of Angela E.*, 402 S.W.3d 636 (Tenn. 2013), for the proposition that a prior order suspending a parent's visitation rights does not preclude a finding that the parent's failure to visit was willful. In *Adoption of Angela E.*, the father "had not exercised parenting time with the children for almost three years," and "had taken no steps to have his parenting time reinstated despite language in the August 2002 order providing that he could petition the trial court 'for a hearing at his earliest convenience.'" *In re Adoption of Angela E.*, 402 S.W.3d at 642. The High Court held that "the prior order suspending Father's visitation rights did not preclude a finding that Father willfully failed to visit the children" when he "took no action to advance the petition" he had previously filed to reinstate visitation. *Id.*

In this case, Mother knew the tasks required of her to resume visitation but failed to complete them and failed to communicate with DCS or the juvenile court concerning her progress on those requirements during the Determinative Period. Although we recognize the difficulties facing Mother during the Determinative Period in maintaining stability while avoiding contact with H.H., we agree with DCS that Mother's inattention to the requirements she knew she must meet in order to resume visitation constituted "knowing inaction" and therefore a willful failure to visit. *See, e.g.*, *State Dep't of Children's Servs. v. J.A.H., Jr.*, No. E2005-00860-COA-R3-PT, 2005 WL 3543419, at *5 (Tenn. Ct. App. Dec. 28, 2005) (determining that the father's failure to visit the child was willful when he knew that court-ordered drug screening with a drug-free result was "the only obstacle" to resumption of his visitation rights but he failed to undergo drug screening or schedule a substance abuse assessment).

As this Court has previously explained:

> Willfulness in the context of termination proceedings does not require the same standard of culpability as is required by the penal code, nor does it require that the parent acted with malice or ill will. *In re Audrey S.,* 182 S.W.3d at 863; *see also In re S.M.*, 149 S.W.3d 632, 642 (Tenn. Ct. App. 2004). Rather, a parent's conduct must have been willful in the sense that it consisted of intentional or voluntary acts, or failures to act, rather than accidental or inadvertent acts. *In re Audrey S.*, 182 S.W.3d at 863. "A parent cannot be said to have abandoned a child when his failure to visit or support is due to circumstances outside his control." *In re Adoption of Angela E.*, 402 S.W.3d at 640 (citing *In re Adoption of A.M.H.*, 215 S.W.3d [793,] 810 [(Tenn. 2007)] (holding that the evidence did not support a finding that the parents "intentionally abandoned" their child)).

- 18 -

*In re Alysia S.*, 460 S.W.3d 536, 565-66 (Tenn. Ct. App. 2014). Here, Mother voluntarily failed to undertake the actions that would have allowed her to resume visitation with the Children.

We therefore conclude that the evidence does not preponderate against the trial court's finding by clear and convincing evidence that Mother failed to visit the Children during the Determinative Period. The trial court did not err in terminating Mother's parental rights to the Children based upon this statutory ground.

### B. Substantial Noncompliance with Permanency Plans

The trial court also found by clear and convincing evidence that Mother failed to substantially comply with the statement of responsibilities set out in the permanency plans. Tennessee Code Annotated § 36-1-113(g)(2) provides as an additional ground for termination of parental rights:

> (2)     There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to the provisions of title 37, chapter 2, part 4[.]

In its final judgment, the trial court detailed several pages of specific findings of fact concerning Mother's failure to substantially comply with the requirements of the permanency plans and what the court found to be DCS's reasonable efforts to assist Mother with compliance. The trial court summarized its findings regarding this statutory ground as to Mother as follows in relevant part:

> [T]he facts clearly support Mother's failure to comply with the Permanency Plan. . . . [T]he Permanency Plan was revised and reiterated with additional requirements, all of which were ratified by the Juvenile Court on March 7, 2017. On that same day, the Juvenile Court . . . made a finding [that] Mother was not in substantial compliance with the Permanency Plan. . . . Mother simply failed to establish a home for six (6) months with no interruptions of water, rent, or utilities; failed to provide proof of a lease; failed to provide an address to DCS; failed to notify DCS of address or phone number changes; failed to contact the *Homeless No More* program; failed to maintain employment; failed to show proof of income to DCS; failed to participate in parenting and substance abuse treatment; and failed to sign a release of information for *Centerstone*. DCS made every reasonable effort to help Mother complete the tasks on the Permanency Plan . . . .

- 19 -

Upon thorough review, we determine that a preponderance of the evidence supports the trial court's findings that Mother failed to substantially comply with what we determine to be the reasonable responsibilities of her permanency plans.

We note at the outset that the trial court in its final order recorded that the juvenile court, in conjunction with finding Mother to be substantially noncompliant with the second permanency plan, had "made a specific finding [that] the Third [permanency plan] contained responsibilities which were reasonable and related to trying to remedy the conditions that necessitated foster care . . . ." The record reflects that Mother made no objection to this finding in the juvenile court. We note, however, that in finding Mother to be in substantial noncompliance with the permanency plans, the trial court did not make its own explicit finding regarding whether Mother's responsibilities were reasonably related to the conditions necessitating foster care. As our Supreme Court has explained:

> A trial court must find that the requirements of a permanency plan are "reasonable and related to remedying the conditions which necessitate foster care placement." Tenn. Code Ann. § 37-2-403(a)(2)(C). We hold that this finding must be made in conjunction with the determination of substantial noncompliance under § 36-1-113(g)(2).
>
> Because the trial court made no finding regarding the reasonableness of [the parent's] responsibilities under the permanency plans, our review of this issue is de novo.

*In re Valentine*, 79 S.W.3d 539, 547 (Tenn. 2002). Accordingly, as in *Valentine*, our review of the reasonableness of Mother's responsibilities under the permanency plans is *de novo* in this case. *See id.*

As to Mother, the specific concerns at the time of the Children's removal to Cousins' home and to which Mother stipulated in the initial dependency and neglect action were her involuntary hospitalization, mental health issues, and illicit drug use, as well as the Children's truancy issues. In the subsequent "Agreed Order of Adjudication and Disposition" upon DCS's dependency and neglect petition, Mother stipulated to a finding of severe abuse "based upon the Mother's exposure of the children to pornography and failure to protect the children from pornography." In addition, by the time that the Children were taken into DCS's protective custody, further revelations concerning alleged physical abuse in the home at the hands of H.H. and Mother's alleged failure to protect the Children had come to light. Furthermore, Mother has never disputed DCS's allegations in the dependency and neglect petition and later in the termination petition that the Children witnessed domestic violence perpetrated by H.H. onto Mother.

- 20 -

Upon review, we determine that the requirements and responsibilities set forth for Mother in the permanency plans were reasonably related to remedying the conditions that led to removal of the Children.

Under the first permanency plan, Mother was required to (1) contact the local child support office and make sure that she was in compliance with child support guidelines; (2) have a stable home for six months with no interruptions in rent and utilities; (3) cooperate with unannounced home visits made by a family service worker; (4) provide updated address and contact information to a family service worker; (5) continue seeking employment; (6) remain drug and alcohol free and submit to drug screens; (7) continue participating in mental health counseling through Centerstone; (8) contact the "Homeless No More" program, for which she had been provided information during the CFTM; and (9) attend all medical, counseling, and medication appointments and take medications as prescribed. As the trial court noted in its final order, Mother's requirements under the second and third permanency plans were essentially unchanged other than the directive that she pay $300 monthly in child support and clarifications as to how and when Mother could meet requirements.

When questioned regarding whether she had provided proof of stable housing to DCS throughout 2016, Mother responded: "No, because I was here and there." She acknowledged staying with H.H.'s family for "a month, maybe two" and staying with her friend, S.P., "[m]aybe a couple months." She stated that Ms. Baxter was unable to find her at S.P.'s home because she "[m]ostly . . . just slept there and worked" at Masonite. Mother insisted that she had contacted the Homeless No More program as required in the first permanency plan but that the program did not have a place available. Mother stated that in October 2016, she secured a duplex in Maury County on her own but that she vacated the duplex the next month after she was assaulted by H.H. when he found her in Maury County. According to Mother, she "had [H.H.] arrested" in November 2016. Mother testified that she sought shelter at a domestic violence shelter known as HomeSafe ("HomeSafe") on the night/early morning of November 28-29, 2016, when H.H. was arrested. Mother further testified that after appearing in court on the morning of November 29, she was afraid to return to HomeSafe because she feared that H.H. might be released from jail. Mother stated that she then stayed with friends in Columbia until she relocated to the Center of Hope, a domestic violence shelter in Maury County, in March 2017.

We note that Mother's relocation to the Center of Hope occurred approximately four months before the filing of the termination petition. C.P. testified that she had served as Mother's case manager while Mother was housed at Bridges from March 6, 2017, through March 30, 2017. C.P. reported that Mother came to Bridges as a transfer from the Maury County domestic violence shelter and that Bridges had been contacted

regarding the transfer because Mother's abusive partner, H.H., had located her. According to C.P., Bridges then arranged a transfer for Mother to a domestic violence shelter in Cookeville at the end of March 2017 because H.H. had continued to "stalk" Mother.

Mother testified that she was at the shelter in Cookeville for only a couple of days before she relocated to Gallatin in early April 2017 to stay at HomeSafe. Mother also testified that she moved directly from HomeSafe to the mobile home park on July 11, 2017, a few days after the termination petition had been filed. Mother acknowledged that she did not keep Ms. Baxter apprised of her various changes in location during this time period, although she testified that during a court date, possibly in June 2017, she had given Ms. Baxter her contact information.

Reviewing a summary of her child support payments, Mother stated that she had been ordered to start paying child support on October 6, 2016. She acknowledged that she had difficulty paying child support in the beginning and accrued an arrearage. Mother's testimony and the payment records indicated that by the time of trial, Mother had child support payments taken weekly from her paycheck at Gap, that she had been paying child support since October 2017, and that lump-sum payments made through "intercepts" of her federal income tax refunds had covered her arrearage. As Ms. Baxter pointed out, however, payment records indicated that Mother had not paid any child support from June 2017 through October 2017.

As to permanency plan requirements beyond communicating with DCS, paying child support, and securing stable housing and employment, Mother acknowledged that she had not completed "classes . . . [f]rom the court-ordered services." As the trial court noted, Ms. Baxter, who was the family services worker assisting the family through September 2017, testified that Mother "never did anything she was asked to do, even after repeated requests to do so, and after having been given every opportunity to complete the requirements of the Plans." Mother did testify that she had ultimately completed a parenting class while residing at HomeSafe in June 2017. At trial, she presented a certificate of completion that was marked for identification purposes only because the trial court found that it had not been properly authenticated.

Concerning Mother's requirements to address her substance abuse, Mother points out within the facts section of her appellate brief that she had tested negative for illicit drugs in March 2015 as the result of a hair follicle test. Ms. Primm testified concerning this negative drug screen and stated that it indicated that Mother had not used illicit drugs for ninety days prior to the test. We note that in March 2015, DCS was providing services to the family in a noncustodial function because the Children were not yet in DCS's protective custody. Ms. Primm also testified, however, that on March 26, 2015,

the date of a CFTM, she administered a drug screen to Mother from which Mother tested positive for opiates and oxycodone. Ms. Primm reported that in May 2015, she attempted to administer drug screens to Mother on two occasions when Mother stated that she could not produce urine samples due to medical issues.

Ms. Baxter testified that after the Children were placed in DCS's protective custody, she attempted to administer random drug screens to Mother several times but was unable to obtain urine samples to screen. According to Ms. Baxter, although she requested a sample from Mother for a drug screen while at court in September 2016, the drug screen was not completed because Mother "urinated a little and then dumped it into the toilet." Mother testified that due to "revision surgeries" she had undergone after a transvaginal mesh procedure, she needed advance warning to be able to produce a urine sample and that DCS personnel had insisted on demanding samples without warning.

Ms. Baxter further testified that although Mother told Ms. Baxter that she had completed all but the graduation ceremony for the outpatient drug treatment program at Vanderbilt, Ms. Baxter later discovered that Mother had not completed the treatment program "at all." An August 27, 2015 discharge summary from Health Connect, presented as an exhibit at trial, reflected that Mother had discontinued Health Connect's intensive outpatient treatment program against medical advice. Additionally, a November 11, 2016 "Letter of Concern" sent by Main Street to DCS, also presented as an exhibit, reflected that Mother had "missed the last 3 classes" in her outpatient treatment program at that time. Mother testified to the chaos created in her life as she attempted to avoid contact with H.H. and how this interfered with her completion of classes and treatment programs. In her testimony, she maintained that she had completed all but the graduation ceremony of the Vanderbilt program. However, Mother presented no documentation of a completed outpatient treatment program.

Moreover, as the trial court found, "Mother made no progress on the third [permanency plan] to reintegrate her back into her Children's lives until the termination of parental rights Petition was filed." *See, e.g.*, *In re A.W.*, 114 S.W.3d 541, 546 (Tenn. Ct. App. 2003) (noting within the context of the statutory ground of substantial noncompliance that improvements made after the filing of the termination petition may be "too little, too late" and that a court is not required "to defer a decision so that the mother [can] have more time to demonstrate that her improvement [is] permanent.") (citing *State v. Pruitt*, No. M2000-00416-COA-R3-CV, 2000 WL 827957, at *8 (Tenn. Ct. App. June 27, 2000)). We determine that the trial court did not err in terminating Mother's parental rights upon clear and convincing evidence of the statutory ground of failure to substantially comply with the permanency plans.

## C. Severe Child Abuse

The trial court further found clear and convincing evidence that Mother had severely abused the Children. Regarding this ground for termination of parental rights, the version of Tennessee Code Annotated § 36-1-113(g)(4) (2017) in effect at the time the termination petition was filed in the instant action provided:[7]

4)　　The parent or guardian has been found to have committed severe child abuse as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against the child who is the subject of the petition or against any sibling or half-sibling of such child, or any other child residing temporarily or permanently in the home of such parent or guardian[.]

Tennessee Code Annotated § 37-1-102(b)(27) (Supp. 2020) defines "severe child abuse," in relevant part, as:

(A)(i)　The knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death and the knowing use of force on a child that is likely to cause serious bodily injury or death;

As this Court has previously explained:

[A] parent's conduct is "knowing, and a parent acts or fails to act 'knowingly,' when . . . she has actual knowledge of the relevant facts and circumstances or when . . . she is either in deliberate ignorance of or in reckless disregard of the information that has been presented to . . . her."

---

[7] Effective July 1, 2018, the General Assembly has amended Tennessee Code Annotated § 36-1-113(g)(4), replacing the former language in its entirety with the following:

The parent or guardian has been found to have committed severe child abuse, as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against any child[.]

See 2018 Tenn. Pub. Acts, Ch. 875, § 11 (H.B. 1856). The amendment essentially eliminates the requirement that the victim of severe abuse be the child at issue or a half-sibling of the child at issue. See id.

*In re H.L.F.*, 297 S.W.3d 223, 236 (Tenn. Ct. App. 2009) (quoting *In re R.C.P.*, No. M2003-01143-COA-R3-PT, 2004 WL 1567122, at *7 (Tenn. Ct. App. July 13, 2004)).

At the time of the instant termination petition's filing, "[s]erious bodily injury" was defined in Tennessee Code Annotated § 39-15-402(c) (2018) as follows:[8]

> "Serious bodily injury to the child" includes, <u>but is not limited to</u>, second- or third-degree burns, a fracture of any bone, a concussion, subdural or subarachnoid bleeding, retinal hemorrhage, cerebral edema, brain contusion, injuries to the skin that involve severe bruising or the likelihood of permanent or protracted disfigurement, including those sustained by whipping children with objects.

(Emphasis added.) "The most serious consequence of a finding that a parent has committed severe child abuse is that such a finding, in and of itself, constitutes a ground for termination of parental rights." *In re Samaria S.*, 347 S.W.3d 188, 201 (Tenn. Ct. App. 2011) (quoting *State Dep't of Children's Servs. v. M.S.*, No. M2003-01670-COA-R3-CV, 2005 WL 549141, at *10 (Tenn. Ct. App. Mar. 8, 2005)).

Following a hearing upon DCS's dependency and neglect petition, the juvenile court entered an agreed adjudicatory order on September 29, 2016, finding the Children to be "dependent and neglected and severely abused children," pursuant to the statutory definition codified at the time of DCS's dependency and neglect petition's filing at Tennessee Code Annotated § 37-1-102(b)(21), "based upon the Mother's exposure of the children to pornography and failure to protect the children from pornography."[9] The juvenile court noted that Mother had waived her "rights to hearings and appeals regarding the claims of dependency and neglect and severe abuse," upon what she referred to as an announcement "akin to a best interest plea" during the hearing.

In finding this ground by clear and convincing evidence, the trial court specifically relied on the juvenile court's findings in its September 2016 "Agreed Order of Adjudication and Disposition":

---

[8] Effective July 1, 2019, the General Assembly has amended the definition of "[s]erious bodily injury to the child" contained in Tennessee Code Annotated § 39-15-402(c) to include "acts of female genital mutilation as defined in § 39-13-110." *See* 2019 Tenn. Pub. Acts, Ch. 268, § 3 (S.B. 1166).

[9] Effective May 23, 2018, the General Assembly has recodified the definition of severe child abuse at Tennessee Code Annotated § 37-1-102(b)(27). *See* 2018 Tenn. Pub. Acts, Ch. 1052, § 5 (H.B. 2271). The definition remains substantively unchanged.

Mother entered into an *Agreed Order of Adjudication and Disposition* as to the Petition and response to the bench *Order* filed by DCS on September 29, 2016. As part of the *Agreed Order*, Mother did not contest the finding of severe child abuse pursuant to T.C.A. § 37-1-102(b)[(13)] and T.C.A. § 37-1-129 based upon Mother's exposing the minor Children to pornography and/or failure to protect the Children from exposure to pornography. The finding Mother committed severe child abuse is therefore *res judicata* and is also a final order, non-appealable judgment. When there is an existing final order upon the merits by a court of competent jurisdiction, that ruling is conclusive of rights, questions, and facts in issue as to the parties. *Galbreath v. Harris*, 811 S.W.2d 88, 90 (Tenn. Ct. App. 1990). As a result, the Court's presiding over the termination action is precluded from reconsidering whether Mother committed severe abuse based upon the doctrine of *res judicata*.

(Paragraph numbering omitted.)

Tennessee Code Annotated § 36-1-113(g)(4) allows a trial court to terminate a parent's rights on the ground of severe child abuse if the parent "has been found to have committed severe child abuse as defined in § 37-1-102, under any prior order of a court" (emphasis added). It is well settled that a trial court may rely on a prior court order finding severe child abuse and is not required to re-litigate the issue of severe abuse at the trial to terminate parental rights. *See In re Samaria S.*, 347 S.W.3d at 201; *State, Dep't of Children's Servs. v. M.S.*, No. M2003-01670-COA-R3-CV, 2005 WL 549141, at *10 (Tenn. Ct. App. Mar. 8, 2005). In the case at bar, the trial court properly found that the September 29, 2016 juvenile court order was *res judicata* as to the issue of whether Mother committed severe child abuse. As this Court concluded in *In re Serenity S.*:

> Because Mother did not appeal the trial court's finding of severe child abuse within the time allowed by law, the order became a final order and the finding of severe child abuse is *res judicata*. Thus, the trial court did not err in finding that Mother has committed severe abuse for purposes of terminating her parental rights.

No. W2014-00080-COA-R3-PT, 2014 WL 6612571, at *6 (Tenn. Ct. App. Nov. 24, 2014). We therefore affirm the trial court's determination that this statutory ground for termination was proven by clear and convincing evidence.

## D. Failure to Manifest an Ability and Willingness to Assume
## Custody or Financial Responsibility of the Children

The trial court also found clear and convincing evidence to support termination of mother's parental rights pursuant to Tennessee Code Annotated § 36-1-113(g)(14) (2017). The version of this ground for termination in effect at the time of the petition's filing provided:[10]

> A legal parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

Our Supreme Court has recently explained the following with regard to this ground for termination of parental rights:

> Two prongs must be proven by clear and convincing evidence to terminate parental rights under this statute: (1) the parent or legal guardian failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the child; and (2) placing the child in the parent's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

*In re Neveah M.*, ___ S.W.3d ___, ___, No. M2019-00313-SC-R11-PT, 2020 WL 7258044, at *11 (Tenn. Dec. 10, 2020).

As to the first prong, our Supreme Court has held:

> [S]ection 36-1-113(g)(14) places a conjunctive obligation on a parent or guardian to manifest both an ability and willingness to personally assume legal and physical custody or financial responsibility for the child. If a person seeking to terminate parental rights proves by clear and convincing proof that a parent or guardian has failed to manifest either ability or willingness, then the first prong of the statute is satisfied.

---

[10] Effective July 1, 2018, the General Assembly has amended Tennessee Code Annotated § 36-1-113(g)(14) to replace the phrase, "A legal parent," with "A parent." *See* 2018 Tenn. Pub. Acts, Ch. 875, §12 (H.B. 1856).

*Id.* at \_\_\_, \*14 (citing *In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280, at \*13 (Tenn. Ct. App. June 20, 2018)). Concerning the "substantial harm" requirement of the second prong, this Court has observed:

> The courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

*In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at \*8 (Tenn. Ct. App. Apr. 4, 2018) (quoting *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001) (footnotes omitted in *Maya R.*)).

In the instant action, the trial court found regarding this statutory ground as to Mother in pertinent part:

> Despite the fact Mother was given every opportunity to work with DCS, and despite the fact Mother was under an obligation from three (3) separate Family Permanency Plans and three (3) court orders to help herself by providing to DCS proof she had a stable home and a stable income, Mother was simply unable to provide proof of a stable home (much less a place to live) or to be financially responsible for [the Children], and further, Mother showed no desire to take the necessary steps to reintegrate herself with [the Children].
>
> On July 7, 2017, the same date as the filing of the initial Petition for the termination of parental rights of both Mother and Father, Mother's last known place where she was [living] was a domestic violence shelter in Gallatin, Tennessee.
>
> On the date of the transfer of the Children to foster care until the date of the filing of the Petition for termination of parental rights, Mother made child support payments only for the months of June 2017, July 2017, August 2017, September 2017, and October 2017.
>
> Mother admitted she was unable to pay child support because she could not keep a job or keep a home on a consistent basis and was not

- 28 -

following the required court orders and plans for managing her addiction issues.

Thus, at the time of the filing of the termination of parental rights [petition], Mother had no safe home; had stopped making all child support payments; never completed services to make it safe for the Children to return to her; and, despite the fact Mother was given every opportunity to help herself through interaction with the courts and DCS; Mother was simply unable to do the minimum required with any one of the [permanency plans] which were presented to her for completion.

* * *

[T]here was an array of resources offered by DCS to Mother . . . . However, Mother has been unwilling to personally assume custody of the Children despite the fact she was made aware of the steps she must take in order to regain custody of her Children. The facts show by clear and convincing evidence that Mother demonstrated an unwillingness to take those steps, as previously stated, throughout the period of time the Children remained in the custody of DCS, Mother neither showed nor had the willingness to assume custody of her Children.

Based upon the Court's findings of fact as to [this ground] as to Mother, the Court concludes since Mother has demonstrated little, if any, willingness to remedy her circumstances after she was given ample opportunities over a long period of time to do so, the Children would be placed at a substantial risk of harm should they be returned to Mother's custody.

(Internal citations to record and paragraph numbering omitted.) Upon careful review, we agree with the trial court.

Regarding the first prong in the instant action, the trial court found that DCS had proven by clear and convincing evidence that Mother had not manifested an ability and willingness to personally assume legal and physical custody of the Children or financial responsibility for the Children. The trial court specifically found that at the time of the termination petition's filing, Mother had not demonstrated the ability and willingness to establish a stable home, steady income, or reintegration into the Children's lives through compliance with the requirements of the permanency plans.

- 29 -

We recognize that considering Mother's flight from H.H. and successive stays in domestic violence shelters, culminating at the approximate time of the termination petition's filing, her testimony at trial that she was then living in a mobile home and working steadily demonstrated some progress in her stability since the filing of the termination petition. However, Mother still had presented no documentation of a lease to DCS, was living with an individual unknown to the Children and DCS, and had not presented documentation of completion of the substance abuse treatment or mental health treatment previously ordered by the juvenile court. DCS met its burden regarding this prong.

The second prong of this statutory ground requires DCS to prove by clear and convincing evidence that placing the Children in Mother's legal and physical custody would pose a risk of substantial harm to the Children's physical and psychological welfare. The trial court found clear and convincing evidence of this prong based on its finding that because Mother had "demonstrated little, if any, willingness to remedy her circumstances after she was given ample opportunities over a long period of time to do so, the Children would be placed at a substantial risk of harm should they be returned to Mother's custody." The trial court thereby found that DCS also had met its burden regarding this prong. We agree with the trial court on this point. Additionally, we determine that the evidence also demonstrated that placing the Children in Mother's legal and physical custody would pose a risk of substantial harm to their physical and psychological welfare based on the domestic violence to which the Children had been undeniably exposed while in Mother's home, Mother's admission of severe abuse in the Children's exposure to pornography and her failure to protect them, the Children's testimony during these proceedings as to the physical abuse inflicted by H.H., Mother's continuing battle to separate herself from H.H. at the time of the termination petition's filing, and Mother's establishment of a home at the time of trial with a paramour that the Children had never met.

The evidence does not preponderate against the trial court's finding that placing the Children into Mother's custody would pose a risk of substantial harm to the Children's physical and psychological welfare. Accordingly, we affirm the trial court's determination by clear and convincing evidence regarding this statutory ground for termination of Mother's parental rights.

V. Best Interest of the Children

Mother contends that in finding that termination of her parental rights was in Jessica's best interest, the trial court erred by failing to properly consider Jessica's testimony and by contemplating Jessica's adoption into her foster family. Noting Jeremy's testimony that he was in favor of termination of Mother's parental rights and

that he desired to be adopted by his foster family, Mother has not raised an issue concerning the trial court's determination as to Jeremy's best interest. However, as with the statutory grounds, this Court must "review thoroughly the trial court's findings as to . . . whether termination is in the child's best interests." *See In re Carrington H.*, 483 S.W.3d at 525. We will therefore review the trial court's best interest analysis as to both of the Children. Specifically as to Jessica, however, we begin our analysis with consideration of Mother's motion filed with this Court for consideration of a post-judgment fact.

### A. Mother's Motion to Consider Post-Judgment Fact

Mother has filed a motion, pursuant to Tennessee Rule of Appellate Procedure 14, requesting that this Court consider a post-judgment fact, namely that Jessica purportedly no longer resides with the foster family she resided with at the time of the termination trial. This Court has previously explained as follows with regard to a motion to consider post-judgment facts:

Pursuant to Rule 14 of the Tennessee Rules of Appellate Procedure, this Court may consider facts occurring after the judgment in the trial court. *See* Tenn. R. App. P. 14(a) ("The Supreme Court, Court of Appeals, and Court of Criminal Appeals on its motion or on motion of a party may consider facts concerning the action that occurred after judgment."). According to Rule 14:

While neither controlling nor fully measuring the court's discretion, consideration generally will extend only to those facts, capable of ready demonstration, affecting the positions of the parties or the subject matter of the action such as mootness, bankruptcy, divorce, death, other judgments or proceedings, relief from the judgment requested or granted in the trial court, and other similar matters.

Tenn. R. App. P. 14(a). This Court's decision to grant or deny a motion to consider post-judgment facts is discretionary. Motions to consider post-judgment facts are governed by Rule 22's motion practice. Tenn. R. App. P. 14(b) ("A motion in the Supreme Court, Court of Appeals, or Court of Criminal Appeals to consider post-judgment facts pursuant to subdivision (a) of this rule shall be made in the manner provided in rule 22."). The Advisory Committee Comments to Rule 14 indicate that post-judgment facts are appropriate for consideration when they are "unrelated to the

merits[,] [] not genuinely disputed, [and] necessary to keep the record up to date."

*Stacey Fair v. Clarksville Montgomery Cty. Sch. Sys.*, No. M2017-00206-COA-R3-CV, 2017 WL 4773424, at \*2 (Tenn. Ct. App. Oct. 23, 2017).

With her motion seeking this Court's consideration of a post-judgment fact, Mother filed an affidavit, executed by Mother's counsel on September 21, 2020, stating that Jessica had contacted Mother on January 11, 2020, with the information that she was no longer living in the pre-adoptive home and that this information was subsequently confirmed by the DCS case worker and DCS attorney. In response, DCS filed an objection to Mother's motion, asserting that the alleged fact was inappropriate for consideration under Rule 14(a) because, *inter alia*, the statements in Mother's counsel's affidavit consisted of hearsay and the effect of the alleged fact, if demonstrated, would be open to dispute in a contested hearing.

We determine, in our discretion, that it is inappropriate to consider the alleged post-judgment fact in Mother's Rule 14(a) motion. The alleged fact is not capable of ready determination without an evidentiary hearing and does not change the procedural position of the parties or the subject matter of this action. *See* Tenn. R. App. P. 14(a). Moreover, the alleged fact could potentially affect one of many factors considered by the trial court in weighing whether termination of Mother's parental rights was in Jessica's best interest. In addition to being related to the merits of the action, the effect of the alleged fact could be genuinely disputed, as the parties have disputed the potential effect on appeal. *See Stacey Fair*, 2017 WL 4773424, at \*2 ("The Advisory Committee Comments to Rule 14 indicate that post-judgment facts are appropriate for consideration when they are 'unrelated to the merits[,] [] not genuinely disputed, [and] necessary to keep the record up to date.'"). We therefore deny Mother's motion to consider a post-judgment fact. Accordingly, DCS's issue concerning the effect of Mother's proposed post-judgment fact on the best interest analysis is pretermitted as moot.

### B. Best Interest Analysis

When a parent has been found to be unfit by establishment of at least one statutory ground for termination of parental rights, as here, the interests of parent and child diverge, and the focus shifts to what is in the child's best interest. *In re Audrey S.*, 182 S.W.3d at 877; *see also In re Carrington H.*, 483 S.W.3d at 523 ("The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." (quoting *In re Angela E.*, 303 S.W.3d 240, (Tenn. 2010))). Tennessee Code Annotated § 36-1-113(i) (Supp. 2020) provides a list of factors the trial court is to consider when determining if termination of parental

rights is in a child's best interest. This list is not exhaustive, and the statute does not require the court to find the existence of every factor before concluding that termination is in a child's best interest. *See In re Carrington H.*, 483 S.W.3d at 523; *In re Audrey S.*, 182 S.W.3d at 878 ("The relevancy and weight to be given each factor depends on the unique facts of each case."). Furthermore, the best interest of a child must be determined from the child's perspective and not the parent's. *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004).

Tennessee Code Annotated § 36-1-113(i) lists the following factors for consideration:

(1)     Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2)     Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3)     Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4)     Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5)     The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6)     Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7)     Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8)     Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9)     Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

As our Supreme Court has explained regarding the best interest analysis:

"The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." In re Angela E., 303 S.W.3d [240,] 254 [(Tenn. 2010)].

When conducting the best interests analysis, courts must consider nine statutory factors listed in Tennessee Code Annotated section 36-1-113(i). These statutory factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis. In re Carrington H., 483 S.W.3d at 523 (citing In re Audrey S., 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)). Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." In re Kaliyah S., 455 S.W.3d [533,] 555 [(Tenn. 2015)] (citing In re Audrey S., 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." Id. When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." In re Audrey S., 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. Id. "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child. . . ." Tenn. Code Ann. § 36-1-101(d) (2017).

Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. In re Audrey S., 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. White v.

<u>Moody</u>, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. <u>See In re Audrey S.</u>, 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. <u>In re Carrington H.</u>, 483 S.W.3d at 523. "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." <u>In re Audrey S.</u>, 182 S.W.3d at 878 (citing <u>White v. Moody</u>, 171 S.W.3d at 194). But this does not mean that a court is relieved of the obligation of considering all the factors and all the proof. Even if the circumstances of a particular case ultimately result in the court ascribing more weight—even outcome determinative weight—to a particular statutory factor, the court must consider all of the statutory factors, as well as any other relevant proof any party offers.

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017).

In the instant action, the trial court concluded that the statutory factors weighed against maintaining Mother's parental rights to the Child. In its final order, the trial court specifically found regarding these factors relevant to Mother:

[Factor One] As to Mother, despite the consistent offer of assistance from DCS in various areas of need for Mother, she has failed to take advantage of the numerous offers of assistance. . . . DCS, among other things, provided referrals for parenting services for Mother; substance abuse services for Mother; consistent contact information for substance abuse services for Mother; provided contact information for *Homeless No More* programs for Mother; prior to foster care, provided Mother with opportunities to attend family counseling; intensive out-patient substance abuse treatment; therapeutic visitations; background checks for over one (1) year; parenting assessment; random drug screens; referrals to mental health treatment for Mother; providing lists of income-based housing for Mother; and, despite all of this help and offer of assistance on a consistent basis for a considerable length of time, Mother failed to follow up and take advantage of these services even after DCS continued to try and encourage Mother to take advantage of all of the opportunities which would be able to assist her in trying to pull her life together and do whatever was necessary to work with DCS and take advantage of services provided by DCS so that

she could begin the journey of reestablishing a relationship with her Children.

As previously set forth in this Court's findings of fact, Mother had difficulty maintaining and keeping a telephone. Mother stated she really did not keep a telephone in 2016, and she had no idea who her case worker was when she finally obtained a telephone in 2017.

Further, Mother admitted DCS provided her with housing information in order for her to assist herself in finding suitable housing, with this information being provided to her for several sources of housing in Hickman, Maury, and Dickson Counties, yet Mother made no viable efforts to help her take advantage of these opportunities.

In addition, it is clear from this Court's findings of fact that Mother was unable to maintain any type of regular visitation, parenting time, or any other type of meaningful contact with her Children.

[Factor Two] Throughout the Court's findings of fact, Mother has not maintained any semblance of regular parenting time or other such contact, despite the fact Mother was given every opportunity to begin regular contact with her Children and was also given numerous opportunities to resolve her personal conflicts and issues with regard to addiction, drug abuse, and other issues so she could begin a course of establishing a history of sobriety and begin to reinstitute a relationship with her Children. Therefore, Mother has failed to effect a lasting adjustment, after reasonable efforts being offered to her through DCS over many months of time, and that any lasting adjustment does not appear reasonably possible under the facts of this case.

[Factor Three] As to Mother, she told Ms. Ray she did not want to disrupt Jeremy and Jessica from their placements. Mother also said she was happy the Children were doing well where they were, and she would consider surrendering her parental rights.

Mother testified her Children are well taken care of and have [integrated] into their good foster homes, and they have bonded with their foster families.

In addition, Mother stated the Children love where they are placed with their foster parents, and she is not asking to take the Children from their foster homes.

The Court therefore finds the parents have not maintained regular visitation or other meaningful contact with the Children.

[Factor Four]  The issue in this factor is essentially whether or not the relationship of Mother . . . to the Children is in fact meaningful, and, if so, has the meaningful relationship otherwise been established among the parents and the Children.  The Court relies upon the information provided in factor numbers 1, 2, and 3 above and simply reiterates that there is no meaningful relationship among the Mother . . . and the Children.

[Factor Five]  Mother has not visited with Jessica in three (3) years. . . . . Mother confirmed her family performed an intervention in order to aid and assist her and remove her from the abusive situation she was experiencing with her live-in boyfriend, [H.H.].

On December 25, 2014, Mother was transported by local Hickman County Police to *Vanderbilt Hospital*.  Mother confirmed in her testimony she knew and realized she was admitted to *Vanderbilt Hospital* for abuse of opiates, abuse of alcohol, and depression.  Mother also stated she felt as though she was about to have a nervous breakdown as a result of issues in her life that she could not resolve.[11]

Even though Mother was given the opportunity to continue with mental health treatment, she failed to help herself and to take advantage of numerous opportunities from DCS to obtain mental health treatment as well as drug addiction treatment, all the way up to the second day of the termination of parental rights hearing.

[Factor Six]  The Children disclosed their sexual abuse and physical abuse suffered by each of them at the hands of [H.H.].

Specifically, Jeremy disclosed that [H.H.] hit him several times directly in the head with his fist.

---

[11] Mother also testified during the termination trial that she had been diagnosed at Vanderbilt with "bipolar disorder II."

In addition, both children disclosed to Ms. Primm that [H.H.] had abused their Mother in the presence of both Children. Jeremy told Ms. Primm that [H.H.] would drag Jeremy across the room by his hair and would make Jeremy stand in a corner for hours at a time without moving. The Children were told that if they complained to their Mother, [H.H.] would hurt their Mother, too. Jessica confirmed with Ms. Primm she had witnessed [H.H.'s] hitting and choking her Mother. Jessica told Ms. Primm that [H.H.] would hit both her and her brother repeatedly with belts as well as using the buckle of the belt in hitting them, and that the belt would also hit their shoulders. Jeremy told Ms. Primm he and Jessica would have bruises and their Mother would not take them to the doctor to get treated. Jeremy stated the bruises on their bodies would "swell up," but their Mother would not take them to the doctor.

Jessica also confirmed through [Jessica's Foster Mother] [that] she saw Jeremy's being beaten with a 2 x 4.

In addition . . . Jessica told [Jessica's Foster Mother] her Mother made her wear a shock collar to a birthday party and that Jessica was shocked through the shock collar every time she said something. When asked about the shock collar, Mother would not admit any knowledge of the incident, but admitted they were all at the birthday party referred to by her daughter, Jessica.

Mother admitted that while at the birthday party, someone told her Jessica had the shock collar around her neck. Jessica disclosed later the person who made her wear the shock collar was [H.H.], Mother's boyfriend. Jeremy also disclosed to [Jeremy's Foster Mother] [that] Mother's boyfriend, [H.H.], physically abused him.

Mother confirmed as early as 2013, [H.H.] would beat her Children in front of her and continued to do so on several occasions. Mother confirmed she did not believe her Children would lie about the abuse they suffered at the hands of [H.H.].

Finally, Mother confirmed that at times when she would black out from drinking and/or drug use, she would later wake up and find that her Children had unexplained bruises and welts on them. Regardless, Mother continued to expose her Children to domestic abuse, sexual violence, and other horrendous conduct while she stood by and did nothing; and, Mother continued to expose the Children to [H.H.], even in the face of a valid "no-

contact" order entered by the [juvenile court]. In the Summer of 2015, after the *Order* had been entered, Mother exposed the Children to [H.H.] while they were staying at the *Days Inn* in Dickson, Tennessee by taking Jessica to see [H.H.] in August of 2015.

Unfortunately, Mother denied her Children had been abused and refused to take any responsibility for allowing the Children to be abused as described above. Typically, Mother, unfortunately, blames others for her Children's trauma instead of taking responsibility for her lack of action in protecting her own Children time and time and again. In fact, Mother blamed [Cousins] for the Children's resulting physical abuse, and, Mother continued to stay with her Children in the presence of [H.H.] and [H.H.'s] family.

When given the opportunity, Mother never accepted the help provided by DCS in getting away from [H.H.]. In addition, Mother never reported to DCS that [H.H.] held her against her will and abused her, even though she came to a DCS meeting with two (2) black eyes. To the contrary, Mother continued to mislead DCS about her relationship with [H.H.]. From several sources, Mother testified she continued her relationship with [H.H.], nonetheless, and never called the police for [H.H's] assaulting her until late November 2016.

[Factor Seven] As to Mother, she has admitted being in fear of her life while living at a duplex in Columbia, Tennessee due to [H.H.'s] finding where she lived in the duplex in Columbia, Tennessee.

At one point, Mother testified she voluntarily entered into a domestic violence shelter in Williamson County, Tennessee in March 2017 for two (2) to three (3) weeks, and maybe even a month when she claimed that [H.H.] found her in Williamson County, stating he was supposed to attend classes there. On another occasion, Mother stated she stayed with a friend in Columbia, Tennessee in January 2017, but somehow, [H.H.] found her at her friend's home. When Mother claimed she stayed in a domestic violence shelter in Maury County, Tennessee, she claimed she was too afraid to stay in the duplex [or] in the domestic violence shelter because [H.H.] frequented a bar very near the duplex that Mother found on her own and rented, knowing full well [H.H.] frequented the bar nearby.

In addition, Mother claimed she went to a domestic violence shelter in early 2017 for two (2) days in Crossville, Tennessee. Mother further

testified she went to *HomeSafe*, which is a domestic violence shelter in Gallatin, Sumner County, Tennessee, for approximately three (3) months in the Spring and Summer of 2017. However, Mother further testified she owned a home with her father . . . in Centerville, Tennessee, but she signed a deed transferring the property back to her father after her Children were born.

Mother admitted [J.M.], who was convicted of vehicular homicide in 2017 and spent ten (10) years in prison, was also convicted of driving under the influence. Mother admitted to starting her relationship with another man, J.M., shortly after he was released from prison on a conviction of vehicular homicide. Later, despite the fact Mother's Children are not allowed to stay in the same room together, Mother stated she had one (1) bedroom for her Children, although she further stated the Children have never lived with [J.M.], and they do not know him.

[Factor Eight] Mother had admitted to DCS Family Service Worker Ms. Baxter that she had only spoken to treatment centers regarding her mental health needs and issues, and has stated she has been on the verge of a nervous breakdown. Further, with regard to Mother's mental health issues, when Mother was released from *Vanderbilt's* psychiatric clinic, instead of asking DCS for continued help and guidance, she turned to [H.H.'s] family for help and later admits she moved in with [H.H.'s] family in 2015. Regardless, Mother never continued with any mental health treatment and was not receiving any such treatment up to the second day of the termination of the parental rights hearing.

[Factor Nine] The record reflects Mother paid child support on an inconsistent basis after her Children entered into foster care. Mother also skips weeks and sometimes months between payments, and made no child support payments for the period of time from January 6, 2017 through May 19, 2017. Mother made no child support payments in the months of June, July, August, September and October of 2017. Despite the fact Mother was given every opportunity to find an income-based home and to subsequently find a job, she stated she quit paying child support because she could not keep a job and could not keep a home.

(Internal citations to record omitted.)

The trial court expressly found that all nine of the delineated best interest factors "weigh[ed] heavily" against maintaining Mother's parental rights to the Children. In

addition, pursuant to the provision in Tennessee Code Annotated § 36-1-113(i) that the trial court "is not limited to" the listed factors, the trial court also considered what it termed "Mother's lack of interest in the welfare of her Children" and "[t]he Children's relationship with their foster parents," finding that both of these considerations also weighed against maintaining Mother's parental rights. Upon a thorough review of the record and applicable authorities, we agree with the trial court.

On appeal, Mother contends that the trial court failed to "give meaningful consideration of the best interests of the daughter from Jessica's perspective." We disagree. In support of this contention, Mother relies heavily on Jessica's testimony at trial. In contrast to Jeremy, Jessica, then nearly fifteen years of age, testified that she did not desire to have Mother's parental rights terminated. While acknowledging that she had last seen Mother approximately four years prior to trial, Jessica maintained that she would like to see Mother and have visits with her. When questioned regarding whether she would like to live with Mother if Mother were "able to demonstrate she had a good place for [Jessica] to live," Jessica answered in the affirmative.

However, Jessica also acknowledged that when she initially spoke with her GAL, she had stated that she wanted to be adopted because Mother "wasn't doing anything." Jessica explained: "I thought I didn't have a chance at going home, so I gave up." Jessica also acknowledged that she had been disappointed and upset by Mother's inaction. When Jessica's GAL asked, "Is one of the reasons that you want to go home is because you think you need to take care of your mother," Jessica responded, "Well, I thought I did because I thought I could help her a little bit, yeah." Jessica continued: "I thought that I could, you know, make her better, at least a little bit better than what she was and, you know, show her that if she does this – if she does this again, then we'll be back in this situation again." In addition, Jessica expressed concern regarding individuals Mother may live with, stating that she had "heard a little bit" about J.M. and acknowledging that H.H. had been abusive toward her while Mother was also in the home.

Mother also relies on this Court's decision in *In re Kendra P.*, No. E2015-02429-COA-R3-PT, 2016 WL 4065491 (Tenn. Ct. App. July 28, 2016), for the proposition that a parent's unfitness may not require termination of parental rights. We find *Kendra P.* to be factually distinguishable from the case at bar. In *Kendra P.*, the mother raised as her only issue on appeal the best interest analysis concerning her seventeen-year-old daughter, who was in a foster home separate from her three younger siblings, was less than a year away from turning eighteen, and had expressed a strong desire to retain the parent-child relationship with her mother. *In re Kendra P.*, 2016 WL 4065491, at *1. Although this Court affirmed the trial court's findings that DCS had proven the statutory grounds of wanton disregard prior to incarceration and substantial noncompliance with

the permanency plan, this Court reversed the trial court's finding that termination of the mother's parental rights was in the child's best interest based on the lack of any evidence of a pre-adoptive home and "a very meaningful, established relationship" between the mother and the child. *Id.* at *10-11.

In contrast to the mother in *Kendra P.*, who had managed to maintain some visitation with her daughter, *id.* at *9, Mother in the instant action had not seen Jessica for more than four years at the time of the final judgment's entry. In contrast to the daughter's very close proximity in age to majority in *Kendra P.*, Jessica turned sixteen years of age in the month after the trial court's final order was entered, giving her at least two more years at that time to potentially be adopted. Additionally, although Jessica testified that she desired to maintain a relationship with Mother, she expressed some trepidation regarding Mother's living situation and paramour. Jessica also appeared to be concerned that Mother might need her, a concern that certainly does her credit, but one that the trial court properly did not let outweigh Jessica's safety and stability. Moreover, in *Kendra P.*, this Court noted testimony from the DCS case manager that the child was determined to maintain contact with her mother and would do so "regardless of what happens." *Id.* at *10. Finally, in contrast to the instant action, no findings or allegations of severe child abuse in the mother's care had been made in *Kendra P.* that would have raised the risk of abuse if the child were returned to the mother.

Mother also argues that the trial court relied too heavily on its findings regarding how well Jessica was thriving in her foster home. We disagree. The trial court weighed all of the statutory best interest factors in determining that termination of Mother's parental rights was in Jessica's best interest as well as Jeremy's best interest.

Based on our thorough review of the evidence in light of the statutory factors, we conclude that the evidence presented does not preponderate against the trial court's determination by clear and convincing evidence that termination of Mother's parental rights was in the best interest of the Children. Having also determined that statutory grounds for termination were established, we affirm the trial court's termination of Mother's parental rights to the Children.

## VI. Conclusion

For the foregoing reasons, we affirm the trial court's judgment in all respects, including the termination of Mother's parental rights to the Children. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment terminating Mother's parental rights and collection of costs assessed below. Costs on appeal are assessed to the appellant, Grace C.

s/ Thomas R. Frierson, II
THOMAS R. FRIERSON, II, JUDGE